UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-60275-CR-MORENO/SELTZER

18 U.S.C. § 371
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

**DEAN BAKER and
HARRY MICHAEL MOLZ,**

        **Defendants.**
_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information

### MEDICARE PROGRAM

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States

Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

4. Physicians, clinics and other health care providers, including laboratories, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## PART B COVERAGE AND REGULATIONS

6. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7. Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

8. To receive Medicare reimbursement, providers had to make appropriate application to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9. CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10. Payments under Medicare Part B were often made directly to the health care

provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## **THE MEDICARE ADVANTAGE PROGRAM**

11. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

12. Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts A and B of Medicare. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

13. A number of companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

14. Medicare Advantage plans, including UnitedHealth, Humana, WellCare and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

15. These companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, or other health care providers, rather than to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

16. To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, physicians, medical clinics, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in paragraph 5 of this Indictment.

17. When a provider submitted a claim form to a Medicare Advantage program, the provider party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were in fact provided as billed.

18. The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by the Medicare program, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage plan, regardless of whether or not the beneficiary utilized the plan's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence.

CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

## CANCER GENOMIC TESTS

19. Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

20. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

21. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

22. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## **TELEMEDICINE**

23. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

24. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

25. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

## **THE DEFENDANTS AND RELATED ENTITIES**

26. Laboratory 1, a corporation organized under the laws of Pennsylvania, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

27. Laboratory 2, a corporation organized under the laws of Pennsylvania, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

7

28. Laboratory 3, a corporation organized under the laws of Texas, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

29. Laboratory 4, a corporation organized under the laws of Florida and later merged with a corporation organized under the laws of Georgia, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

30. Wolf Branch Technology Group, Inc. was a corporation organized under the laws of Florida with its principal place of business in Broward County, Florida.

31. Defendant **HARRY MICHAEL MOLZ**, a resident of Broward County, Florida, was the owner of Wolf Branch Technology Group, Inc.

32. Defendant **DEAN BAKER**, a resident of Broward County, Florida, was an employee of Wolf Branch Technology Group, Inc.

## CONSPIRACY TO SOLICIT AND RECEIVE HEALTH CARE KICKBACKS
## (18 U.S.C. § 371)

From in or around February 2018, through in or around January 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**DEAN BAKER and
HARRY MICHAEL MOLZ,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and others, known and unknown to the United States Attorney, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal

health care program, that is, Medicare and Medicare Advantage plans.

## PURPOSE OF THE CONSPIRACY

33. It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (a) soliciting and receiving kickbacks and bribes in return for recruiting and referring Medicare beneficiaries to Laboratories 1–4; (b) submitting and causing the submission of claims to Medicare and Medicare Advantage plans for CGx tests that Laboratories 1–4 purported to provide to those Medicare beneficiaries; (d) concealing the kickbacks and bribes; and (e) diverting proceeds for their personal use and benefit, the use and benefit of others and to further the conspiracy.

## MANNER AND MEANS

The manner and means by which the defendant and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

34. **DEAN BAKER** and **HARRY MICHAEL MOLZ** and others obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns, and inducing them to accept CGx tests regardless of medical necessity.

35. **DEAN BAKER** and **HARRY MICHAEL MOLZ** and others obtained doctor's orders for the CGx tests by paying telemedicine companies kickbacks and bribes for doctor's orders written by doctors contracted with the telemedicine companies, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

36. **DEAN BAKER** and **HARRY MICHAEL MOLZ** and others solicited and received kickbacks and bribes from Laboratories 1–4 in exchange for doctor's orders for CGx tests and other Medicare-required documents that would be used to support claims to Medicare and

9

Medicare Advantage plans for those tests from Laboratories 1–4.

37. **DEAN BAKER** and **HARRY MICHAEL MOLZ** and others entered into sham contracts with Laboratories 1–4 that disguised the kickbacks and bribes as payments from Laboratories 1–4 for marketing services.

38. **DEAN BAKER** and **HARRY MICHAEL MOLZ** and others caused Laboratories 1–4 to submit claims to Medicare and Medicare Advantage plans.

39. As a result of these claims, Medicare and Medicare Advantage plans made payments to Laboratories 1–4.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. In or around February 2018, **DEAN BAKER** and **HARRY MICHAEL MOLZ** executed a contract in which they agreed to receive $1,500 for each CGx specimen they referred to Laboratory 4.

2. In or around June 2018, **DEAN BAKER** and **HARRY MICHAEL MOLZ** referred beneficiary D.S. to Laboratory 4 for CGx testing, in exchange for kickbacks and bribes.

3. On or about June 29, 2018, Laboratory 4 submitted a claim to Humana, a Medicare Advantage plan, in the approximate amount of $19,652 for CGx testing purportedly provided to beneficiary D.S.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
### (18 U.S.C. § 982(a)(7))

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of a criminal conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, as alleged in this Information, the defendants so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property subject to forfeiture includes, but is not limited to, the sum of money equal in value to the gross proceeds traceable to the commission of the violation alleged in this Information, which the United States will seek as a forfeiture money judgment as part of each defendant's sentence.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been co-mingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Sections 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


ALLAN MEDINA
ACTING DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
TIMOTHY P. LOPER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

DEAN BAKER and
HARRY MICHAEL MOLZ,

Defendants.

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)
___ Miami   ___ Key West
✓ FTL   ___ WPB   ___ FTP

New defendant(s)        Yes ___   No ___
Number of new defendants    ___
Total number of counts      ___

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   No
   List language and/or dialect   _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                         (Check only one)
   I    0 to 5 days        ✓             Petty       ___
   II   6 to 10 days       ___           Minor       ___
   III  11 to 20 days      ___           Misdem.     ___
   IV   21 to 60 days      ___           Felony      ✓
   V    61 days and over   ___

6. Has this case previously been filed in this District Court?   (Yes or No)   No
   If yes: Judge _____   Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   No
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____

   Is this a potential death penalty case? (Yes or No)   No

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?   Yes ___   No ✓

8. Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   Yes ___   No ✓

_____
TIMOTHY P. LOPER
DOJ TRIAL ATTORNEY
COURT ID NO. A5502016

*Penalty Sheet(s) attached                                       REV 8/13/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**      **HARRY MICHAEL MOLZ**

**Case No:** _____

Count #: 1

  Conspiracy to Solicit and Receive Health Care Kickbacks

  Title 18, United States Code, Section 371

**\*Max Penalty:**   Five (5) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**       DEAN BAKER

**Case No:**

Count #:  1

  Conspiracy to Solicit and Receive Health Care Kickbacks

  Title 18, United States Code, Section 371

**\*Max Penalty**:   Five (5) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| DEAN BAKER, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.


Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| HARRY MICHAEL MOLZ, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*